Filed 9/17/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MARY MELENDREZ et al., | B256928, B259423 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC453161 ) |
| v. | |
| AMERON INTERNATIONAL CORPORATION, | |
| Defendant and Respondent. | |

APPEALS from a judgment of the Superior Court of Los Angeles County, Emilie H. Elias, Judge.  Affirmed.

Simon Greenstone Panatier Bartlett and Brian P. Barrow for Plaintiffs and Appellants.

Foley & Mansfield, J. Scott Wood, Suzanna L. Minasian, Anna K. Milunas, M. Amadea Groseclose and Duncan Lemmon for Defendant and Respondent.

For approximately 24 years, Lario Melendrez worked for defendant and respondent Ameron International Corporation, where he was exposed to asbestos in the manufacture of Ameron's Bondstrand pipe products. In 2011, he died of asbestos-related mesothelioma. His survivors, plaintiffs and appellants Mary Melendrez, individually and as personal representative of Melendrez's estate, Mario Melendrez, Phillip Melendrez, David Melendrez, and Veronica Pueyo (collectively plaintiffs), filed a complaint for wrongful death against Ameron, alleging that in addition to his workplace exposure to asbestos, Melendrez was also permitted to take waste or scrap pipe home, where he was exposed to asbestos in using the pipe for home projects. Ameron moved for summary judgment on the ground that plaintiff's sole and exclusive remedy against Ameron lies in the California Workers' Compensation Act. (Lab. Code, § 3600 et seq.) The trial court agreed, and granted summary judgment.

In these consolidated appeals, plaintiffs first challenge the grant of summary judgment, asserting that workers' compensation does not cover Melendrez's injury to the extent his exposure to asbestos was from working with Bondstrand pipe on his own time at home (Case No. B256928). Second, plaintiffs challenge the trial court's award of expert fees pursuant to Code of Civil Procedure section 998 (Case No. B259423).[1] We conclude that the workers' compensation exclusive remedy rule applies and therefore affirm the grant of summary judgment. We further conclude that the trial court did not abuse its discretion in awarding Ameron expert witness fees. Accordingly, we affirm the judgment.

---

[1] The appeals were consolidated for purposes of oral argument and decision.

2

## FACTUAL AND PROCEDURAL BACKGROUND

Melendrez worked for Ameron and its predecessors from approximately 1961 to 1985, performing various tasks in the manufacture of Ameron's Bondstrand pipe. The pipe, which was designed to transport extremely corrosive materials, contained asbestos, and Melendrez was exposed to asbestos from the manufacturing process in the course of his employment with Ameron.

The plant where Melendrez worked allowed employees to take home reject Bondstrand pipe if they received a permission slip signed by a supervisor. In the 1970's, Melendrez began taking pipe home. According to Melendrez, he took pipe home "every day that [he] could," using it to make flowerpots and part of a patio.

Melendrez's employment with Ameron ended in 1985 when the plant moved to Texas. In December 2010, he was diagnosed with malignant mesothelioma caused by exposure to asbestos. He died in 2011, survived by plaintiffs – his wife and four adult children.

Plaintiffs sued Ameron for wrongful death.[2] Ameron moved for summary judgment on the basis of its affirmative defense that plaintiffs' tort claims were barred by the workers' compensation exclusive remedy rule. (Lab. Code, § 3602.) The trial court granted summary judgment, reasoning that workers' compensation exclusivity barred plaintiffs claim because Melendrez received the pipe only because of his employment with Ameron. Plaintiffs appeal from the resultant

---

[2]    After being sued, Ameron retained Forensic Analytical Environmental Health Consultants to determine whether the pipe that Melendrez took home contained asbestos. On June 8, 2012, counsel for Ameron sent a letter to plaintiffs' counsel setting forth an estimated schedule for the removal of the pipe from Melendrez's home, testing of the house's roof and a storage shed, and abatement and disposal of any pipe that tested positive for asbestos.

3

judgment. The court subsequently awarded Ameron $80,719 in expert witness fees. Plaintiffs also appeal from that order.

## DISCUSSION

I. *Appeal No. B256928, Workers' Compensation Exclusivity Rule*

Plaintiffs contend that that the trial court erred in relying on workers' compensation exclusivity to grant summary judgment. According to plaintiffs, to establish an affirmative defense of workers' compensation exclusivity, Ameron was required to show that Melendrez's separate exposure to asbestos while working with Ameron's scrap pipe at home met the conditions of workers' compensation coverage: i.e., that the exposure arose out of and in the course of Melendrez's employment. Plaintiffs argue that Ameron failed to meet this burden, because in using the pipe at home Melendrez was not performing any service growing out of or incidental to his employment. Thus, the contribution to his mesothelioma caused by his home exposure to asbestos is not covered by workers' compensation.

While we agree that a triable issue of fact exists whether Melendrez's exposure to asbestos at home arose out of and in the course of his employment with Ameron, that issue is not material to the viability of Ameron's defense of workers' compensation exclusivity. It is undisputed that Melendrez's exposure to asbestos in his employment with Ameron substantially contributed to his mesothelioma. Therefore, under the contributing cause standard applicable in workers' compensation law, his mesothelioma is covered by workers' compensation, and his separate exposure at home does not create a separate injury outside workers' compensation coverage. Thus, plaintiffs' lawsuit is barred by workers' compensation exclusivity.

4

*Summary Judgment Principles*

"A defendant moving for summary judgment must show either (1) that one or more elements of the plaintiff's cause of action cannot be established, or (2) 'that there is a *complete* defense to that cause of action.' [Citation.] The burden on a defendant moving for summary judgment based upon the assertion of an affirmative defense is heavier than the burden to show one or more elements of the plaintiff's cause of action cannot be established. Instead of merely submitting evidence to negate a single element of the plaintiff's cause of action, or offering evidence such as vague or insufficient discovery responses that the plaintiff does not have evidence to create an issue of fact as to one or more elements of his or her case [citation], 'the defendant has the initial burden to show that undisputed facts support *each element* of the affirmative defense' [citations]. The defendant must demonstrate that under no hypothesis is there a material factual issue requiring trial. [Citation.] If the defendant does not meet this burden, the motion must be denied. Only if the defendant meets this burden does 'the burden shift[] to plaintiff to show an issue of fact concerning at least one element of the defense.' [Citation.]" (*Anderson v. Metalclad Insulation Corp.* (1999) 72 Cal.App.4th 284, 289-290.)

"We review the trial court's summary judgment rulings de novo. [Citation.] "'In performing our de novo review, we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally, construing [his] evidentiary submission while strictly scrutinizing [the defendant's] own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor." [Citation.]' [Citation.]" (*Ganoe v. Metalclad Insulation Corp.* (2014) 227 Cal.App.4th 1577, 1582.)

5

*Workers' Compensation Principles*

"California's Workers' Compensation Act (Lab. Code, § 3600 et seq.) provides an employee's exclusive remedy against his or her employer for injuries arising out of and in the course of employment." (*Wright v. State of California* (2015) 233 Cal.App.4th 1218, 1229.) The exclusive remedy provision of the act provides, in part, that "'[w]here the conditions of compensation set forth in Section 3600 concur, the right to recover compensation is . . . the sole and exclusive remedy of the employee or his or her dependents against the employer' (Lab. Code, § 3602, subd. (a)), and that '[i]n all cases where the conditions of compensation set forth in Section 3600 do not concur, the liability of the employer shall be the same as if this division had not been enacted' (Lab. Code, § 3602, subd. (c)). The legal theory supporting this exclusive remedy provision 'is a presumed "compensation bargain," pursuant to which the employer assumes liability for industrial personal injury or death without regard to fault in exchange for limitations on the amount of that liability. The employee is afforded relatively swift and certain payment of benefits to cure or relieve the effects of industrial injury without having to prove fault but, in exchange, gives up the wider range of damages potentially available in tort.' [Citation.]" (*Wilson v. Southern California Edison Co.* (2015) 234 Cal.App.4th 123, 141-142.)

"'""The requirement of [Labor Code] section 3600 is twofold. On the one hand, the injury must occur 'in the course of the employment.' This concept 'ordinarily refers to the time, place, and circumstances under which the injury occurs.' [Citation.] Thus '"[a]n employee is in the 'course of his employment' when he does those reasonable things which his contract with his employment expressly or impliedly permits him to do."' [Citation.] And, ipso facto, an

6

employee acts within the course of his employment when "'performing a duty imposed upon him by his employer and one necessary to perform before the terms of the contract [are] mutually satisfied.'"'" [Citation.]' [Citation.] [¶] "'On the other hand, the statute requires that an injury 'arise out of' the employment . . . . It has long been settled that for an injury to 'arise out of the employment' it must 'occur by reason of a condition or incident of [the] employment. . . .' [Citation.] That is, the employment and the injury must be linked in some causal fashion." [Citation.]' [Citation.]"[3] (*Mason v. Lake Dolores Group* (2004) 117 Cal.App.4th 822, 833 (*Mason*).)

"Whether an employee's injury arose out of and in the course of [his] employment is generally a question of fact to be determined in light of the circumstances of the particular case. [Citations.]" (*Wright v. Beverly Fabrics, Inc.* (2002) 95 Cal.App.4th 346, 353.) "When there is no real dispute as to the facts, the question of whether an injury was suffered in the course of employment is one of law, and a purported finding of fact on that question is not binding on an appellate court. [Citations.]" (*City of Los Angeles v. Workers' Comp. Appeals Bd.* (2007) 157 Cal.App.4th 78, 83.)

In the present case, a triable issue of fact exists whether Melendrez's exposure to asbestos at home arose out of and in the course of his employment with Ameron. But, as we explain, that factual issue is not material to the viability

---

[3] The inquiry under Labor Code section 3600 is the same whether determining an employee's eligibility for workers' compensation benefits or the application of the exclusivity rule. (See *LeFiell Manufacturing Co. v. Superior Court* (2012) 55 Cal.4th 275, 284 (*LeFiell*) ["'A fundamental condition of compensation under section 3600 and, hence, a fundamental premise of the exclusivity [rule] is that the compensation sought is for an injury to an employee."].)

7

of Ameron's defense of workers' compensation exclusivity. On the record here, that defense is established as a matter of law.

Given the purposes of workers' compensation, courts have long applied a broad concept of contributing cause to bring injuries within workers' compensation coverage. In short, if a substantial contributing cause of an injury arises out of and in the course of employment, the injury is covered by workers' compensation, even if another, nonindustrial cause also substantially contributed to the injury. As recently explained in *South Coast Framing, Inc. v. Workers' Comp. Appeals Bd.* (2015) 61 Cal.4th 291 (*South Coast Framing*): "[T]he workers' compensation system is not based upon fault. 'It seeks (1) to ensure that the cost of industrial injuries will be part of the cost of goods rather than a burden on society, (2) to guarantee prompt, limited compensation for an employee's work injuries, regardless of fault, as an inevitable cost of production, (3) to spur increased industrial safety, and (4) in return, to insulate the employer from tort liability for his employees' injuries.' [Citations.] Accordingly, '[t]he statutory proximate cause language [of section 3600] has been held to be less restrictive than that used in tort law, because of the statutory policy set forth in the Labor Code favoring awards of employee benefits. In general, for the purposes of the causation requirement in workers' compensation, it is sufficient if the connection between work and the injury be a contributing cause of the injury . . . .' [Citations.]" (*Id.* at pp. 298-299.) Thus, "[d]eath attributable to both industrial and nonindustrial causes may support a death claim [in workers' compensation], and industrial causation has been shown in an array of scenarios where a work injury contributes to a subsequent nonindustrial injury. An employee is entitled to compensation if a new or aggravated injury results from medical or surgical treatment for an industrial injury. [Citations.] Causation may also be shown if an industrial injury

8

contributes to a later nonindustrial accident or injury. [Citations.] Indeed, even a worker's suicide may be compensable if an industrial injury contributed to it." (*Id.* at p. 300.)

Particularly instructive is the Supreme Court's decision in *McAllister v. Workers' Comp. App. Bd.* (1968) 69 Cal.2d 408 (*McAllister*), discussed in *South Coast Framing* (61 Cal.4th at p. 301) as an example of the expansive concept of contributing cause in the workers' compensation context. In *McAllister,* the employee worked as a fireman for 32 years, and died of lung cancer. His wife applied for workers' compensation benefits, and produced expert testimony that the employee's inhalation of smoke in his duties as a fireman caused his death. (69 Cal.2d at p. 411.) The trial referee awarded benefits, but the appeals board annulled the award. On the wife's petition for review, the Supreme Court annulled the appeals board decision.

As here relevant, the court rejected the appeals board's conclusion that to prove her husband's death was caused by his employment, the wife was required to show "the exact amount of each type of smoke inhaled, and the precise danger to decedent from such inhalation. Of course, such a detailed account would have been desirable, but it was not a prerequisite to recovery. Such a burden on applicants would often be unbearable. The exact amount and kinds of pollutants inhaled by decedent could only be known if a chemist had gone with him to each fire over his 32 years as a fireman. The precise toxicity of each type of pollutant, alone or in combination with others, is still not known. [¶] In order to cover such unavoidable uncertainties, we require applicants to establish no more than that industrial causation is reasonably probable." (*McAllister, supra*, 69 Cal.2d at p. 417.)

9

The court also rejected the argument the employee's history as a heavy smoker (a pack a day for 42 years) precluded an award of benefits. "We cannot doubt that the more smoke decedent inhaled – from whatever source – the greater the danger of his contracting lung cancer. His smoking increased that danger, just as did his employment. Given the present state of medical knowledge, we cannot say whether it was the employment or the cigarettes which 'actually' caused the disease; we can only recognize that both contributed substantially to the likelihood of his contracting lung cancer. As we noted, however, in *Employers etc. Ins. Co. v. Industrial Acc. Com.* (1953) 41 Cal.2d 676, 680, the decedent's employment need only be a 'contributing cause' of his injury. And in *Bethlehem Steel Co. v. Industrial Acc. Com.* [(1943)] 21 Cal.2d 742, 744, we pointed out a particular instance of this principle when we stated that it was enough that 'the employee's risk of contracting the disease by virtue of the employment must be materially greater than that of the general public.' Thus in *Bethlehem* we allowed an award to an employee who contracted a contagious eye disease, since he had shown that the disease was more common at his place of employment than among the public. [¶] Although decedent's smoking may have been inadvisable, respondents offer no reason to believe that the likelihood of contracting lung cancer from the smoking was so great that the danger could not have been materially increased by exposure to the smoke produced by burning buildings." (*McAllister, supra*, 69 Cal.2d at pp. 418-419.)

In the present case, under the reasoning of *McAllister*, Melendrez's mesothelioma is covered by workers' compensation. It is undisputed that a substantial contributing cause of Melendrez's disease was his exposure to asbestos from the manufacture of Ameron's Bondstrand pipe in the course of and arising out of his employment with Ameron. Although Melendrez was also exposed to

10

asbestos from working with scrap pipe at home, that exposure does not create a separate injury outside workers' compensation coverage that is compensable in tort law. Indeed, plaintiffs offered no evidence to show the extent to which Melendrez's home exposure to asbestos contributed to his mesothelioma separate and apart from his workplace exposure. The most that can be said is that his home exposure likely contributed to the disease along with his workplace exposure. But under workers' compensation principles, the contribution of his home exposure does not create a divisible, separate injury. The injury – mesothelioma caused by asbestos exposure – is entirely covered by workers' compensation. Thus, plaintiffs' civil action is barred by workers' compensation exclusivity.

Our conclusion is also consistent with the related principle that "the exclusivity provisions encompass all injuries '*collateral to or derivative of*' an injury compensable by the exclusive remedies of the [Workers' Compensation Act]. [Citation.]" (*Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 813 (*Vacanti*), italics added.) "[C]ourts have regularly barred claims where the alleged injury is collateral to or derivative of a compensable workplace injury." (*Id.* at p. 814.) For example, in *Williams v. Schwartz* (1976) 61 Cal.App.3d 628, the plaintiff witnessed the death of her husband in an accident that occurred in the course of his employment. The widow recovered workers' compensation benefits for his death and then filed an action for emotional distress damages. On appeal, the court held that the workers' compensation exclusive remedy provision barred her suit, stating that "'the work-connected injury engenders a single remedy against the employer, exclusively cognizable by the compensation agency and not divisible into separate elements of damage available from separate tribunals . . . .'" (*Id.* at p. 633; see also *Vacanti*, *supra*, 24 Cal.4th at p. 815 ["courts have barred employees from suing for psychic injuries caused by

11

their termination [citation], or their employer's abusive conduct during the termination process [citation]"]; *LeFiell*, *supra*, 55 Cal.4th at p. 284 ["'[c]ourts have held that the exclusive jurisdiction provisions bar civil actions against employers by nondependent parents of an employee for the employee's wrongful death [citation], by an employee's spouse for loss of the employee's services [citation] or consortium [citations], and for emotional distress suffered by a spouse in witnessing the employee's injuries [citations].' [Citations.]"]; *Seide v. Bethlehem Steel Corp.* (1985) 169 Cal.App.3d 985, 991 [workers' compensation exclusive remedy rule barred wrongful death action brought by nondependent parent of deceased employee].)

Here, any injury that Melendrez suffered from working with Bondstrand pipe at home (that injury being an unknown contribution to his mesothelioma) was "'collateral to or derivative of'" the injury he suffered at work (the same mesothelioma also caused by his working with Bondstrand pipe), and thus any injury suffered from home exposure to asbestos is "compensable by the exclusive remedies of the [Workers' Compensation Act]." (*Vacanti, supra*, 24 Cal.4th at p. 813.) Plaintiffs' tort action thus "is barred under the derivative injury and workers' compensation exclusivity rules. [Citations.]" (*LeFiell, supra*, 55 Cal.4th at p. 289.)

To argue that Melendrez's exposure to asbestos at home creates a separate injury beyond the reach of workers' compensation plaintiffs rely on two decisions: *Ralphs Grocery Co. v. Workers' Comp. Appeals Bd.* (1997) 58 Cal.App.4th 647, 652 (*Ralphs*) and *Mason*, *supra*. However, they are distinguishable, because they involved discrete injuries that were entirely outside workers' compensation coverage.

In *Ralphs*, the employee went on disability leave due to an industrial injury to his finger. Later, he was laid off while on disability leave, causing him to lose his medical benefits. He had earlier been diagnosed with cancer. Without his prior medical benefits, he depleted his family savings paying for treatment. He hoped to be reinstated with benefits, but instead he received a telephone call at home from his employer which offered only a part-time position without benefits. According to an expert medical opinion, the stress of the call triggered a fatal heart attack. (*Ralphs, supra*, 58 Cal.App.4th at p. 650.)

The employee's wife sought workers' compensation benefits for the employee's surviving minors. Accepting the expert opinion that the employer's telephone call caused the heart attack, a workers' compensation judge found that the heart attack arose out of and occurred during the course of employment and awarded benefits. The Workers' Compensation Appeals Board upheld the award. The employer petitioned the court of appeal to annul the award, challenging only the finding that the heart attack occurred in the course of employment. (*Ralphs, supra*, 58 Cal.App.4th at pp. 651-652.) The Court of Appeal agreed: "When he was injured, [the employee] was off duty, at home, and spending time with his family on a Sunday evening. He was engaged in no special errand or activity for [the employer]. It would be a stretch of the imagination to say that answering his home phone was an act in the course of [his] employment." (*Id.* at p. 652.)

In *Mason*, an employee of a water park entered the park to complete his shift after the park was closed. In contravention of the park's policy prohibiting after-hours employee use of the water slides, he asked someone to turn on a water slide and then rode down. He suffered injuries rendering him a paraplegic. (*Mason, supra*, 117 Cal.App.4th at pp. 825, 828.) The employee sued the water park for negligence. (*Id.* at p. 826.) In finding the employer negligent, the jury found that

13

the employee's injury did not arise out of or in the course of his employment. (*Ibid.*)  However, the trial court granted the employer's motion for judgment notwithstanding the verdict and alternatively a new trial on the ground that the undisputed evidence showed the negligence action was barred by workers' compensation exclusivity.  (*Id.* at pp. 826, 830.)

The Court of Appeal reversed, concluding that substantial evidence supported the jury's finding the injuries did not arise out of or in the course of employment:  "Substantial evidence showed that he [the employee] was not 'testing' the water slides for [the water park] at the time he was injured. . . .  The evidence also showed that [the water park] had expressly prohibited all of its employees . . . from using the water slides after the park was closed and the slides had been turned off for the day.  [¶]  Thus, the jury could have reasonably concluded [the employee's] use of the water slide was not *reasonably contemplated* by nor *causally connected* to his employment or his employment duties.  He was not 'performing [a] service growing out of and incidental' to his employment at the time he was injured.  (§ 3600, subd. (a)(2).)  Nor was he doing any of 'those reasonable things which his contract with his employment expressly or impliedly permit[ted] him to do.'  [Citation.]"  (*Mason, supra*, 117 Cal.App.4th at p. 834.)

As our discussion of *Ralphs* and *Mason* demonstrates, each involved an injury which fell entirely outside the conditions of workers' compensation coverage.  Neither decision purports to speak to the situation here, in which the employee contracts a single disease which, because it has an industrial cause, is covered by workers' compensation, even though it also has a contributing, nonindustrial cause.  Plaintiffs have offered no authority to support severing such an injury in two – one covered by workers' compensation, and the other not –

based on the contributing causes. Indeed, such a splitting of Melendrez's disease would contravene the purpose of the exclusive remedy rule, which "'conveys the legislative intent that "the work-connected injury engender[] a single remedy against the employer, exclusively cognizable by the compensation agency." [Citation.] . . .'" (*LeFiell*, *supra*, 55 Cal.4th at p. 284.)

Finally, we observe that Labor Code section 3202 states that "the workers' compensation laws 'shall be liberally construed by the courts with the purpose of extending their benefits for the protection of persons injured in the course of their employment.' [Citation.] . . . The rule of liberal construction "is not altered because a plaintiff believes that [he] can establish negligence on the part of [his] employer and brings a civil suit for damages." [Citation.] It requires that we liberally construe the [laws] "in favor of *awarding work[ers'] compensation*, not in permitting civil litigation. [Citation.]" [Citations.]' [Citation.]" (*Mason, supra*, 117 Cal.App.4th at p. 834.) Our decision in the present case implements this policy.

For all of the above reasons, we conclude as a matter of law that workers' compensation exclusivity bars plaintiffs' lawsuit. Therefore, the trial court properly granted summary judgment.

II.    *Appeal No. B259423, Section 998 Settlement Offer*[4]

"Code of Civil Procedure section 998, subdivision (c)(1) provides: 'If an offer [of compromise] made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall not recover his or her postoffer costs and shall pay the defendant's costs from the time of the offer.'

---

[4]    Unspecified statutory references will be to the Code of Civil Procedure.

Costs awardable under this subdivision include 'costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the defendant.' [Citations.]" (*Najah v. Scottsdale Ins. Co.* (2014) 230 Cal.App.4th 125, 143 (*Najah*).)

*Background*

On August 3, 2012, approximately two months prior to trial and six weeks after filing its motion for summary judgment, Ameron made an offer to compromise under section 998, offering a mutual waiver of costs and fees in exchange for a dismissal with prejudice of all of plaintiffs' claims against Ameron. Each of the plaintiffs objected to the offer, stating that the offer was "invalid, ineffective and unenforceable because [the] offer is premature as both fact and expert discovery are on-going. No fact and expert depositions have taken place. . . . As of the date of this objection, Plaintiff has not had the opportunity to notice, or conduct the depositions of any of the remaining Defendants' Persons Most Knowledgeable . . . . As such, this offer is premature and not made in good faith, and is therefore a token offer which is ineffective and unenforceable."

On August 20, 2012, Ameron served its designation of expert witnesses. One of the experts was Steve Long of Forensic Analytical Consulting Services, an industrial hygiene expert with experience in asbestos abatement. Long was expected to testify about an abatement project undertaken at Melendrez's home, which involved surveying the items, removing testing samples from the items, testing the samples for asbestos, and removal or abatement of the items.

On August 30, 2012, the case was stayed pending the appellate court's determination of a writ petition filed by plaintiffs on an unrelated discovery issue

16

against a different defendant. (See *Melendrez v. Superior Court* (2013) 215 Cal.App.4th 1343.) The court granted the petition for writ of mandate in April 2013. (*Id.* at p. 1358.)

In November 2012, Forensic Analytical issued a report indicating that 35 pipes at Melendrez's home contained asbestos and approximately 175 more were untested but were assumed to contain asbestos. The report proposed that Castlerock Environmental, Inc. "perform the containerizing, transport and storage of the pipe components."

The trial court granted Ameron's summary judgment motion on April 10, 2014. Ameron filed a memorandum of costs in the amount of $142,401.25 for costs and expert witness fees. Ameron sought a total of $130,334 in expert fees, consisting of $107,719 to Forensic Analytical for the survey, abatement planning, testing and analyzing of samples at Melendrez's home; $3,000 as an expert retainer fee to Dr. John E. Craighead; and $19,615 "for abatement and canopy demolition services provided by Castlerock at the Melendrez property."

Plaintiffs filed a motion to tax the expert fees. Plaintiffs argued that Ameron was not entitled to recover costs related to the survey and abatement of asbestos on the Melendrez property, arguing that such costs were not allowed under section 1033.5. Plaintiffs further argued that the costs of abatement were not derivative of or necessary to the litigation because there was no dispute that the pipe came from Ameron, and the pipe needed to be removed regardless of whether Melendrez developed mesothelioma or plaintiffs filed a wrongful death action. Plaintiffs further argued that expert witness costs are not allowable unless ordered by the court pursuant to section 1033.5, subdivision (b)(1). Finally, plaintiffs contended that Ameron had not made a reasonable pretrial settlement offer under section 998.

17

The trial court granted in part and denied in part plaintiffs' motion to tax. The court agreed with plaintiffs that the asbestos abatement costs were not recoverable under section 1033.5. The court also agreed that they were not recoverable as expert witness fees because the court did not order them. (§ 1033.5, subd. (b)(1).) Nonetheless, the court rejected plaintiffs' argument that Ameron's abatement costs were unrecoverable under section 998. The court found that Ameron's section 998 settlement offer was reasonable because "it was made (1) close to trial following completion of a significant portion of discovery, including, but not limited to, multiple depositions, and (2) during the pendency of an ultimately successful summary judgment motion based on the workers' compensation exclusivity rule." The court thus held that Ameron was entitled to recover some of its costs, taxing the amount for abatement services provided by Castlerock Environmental and reducing the amount charged by Forensic Analytical by $30,000 "to account for unrecoverable abatement-related expenses." The court noted that Forensic Analytical's invoices were "somewhat vague as to the charges that relate specifically to abatement planning and actual abatement," but the court "believe[d] $30,000.00 is a reasonable estimate of the total value of such charges." The court thus awarded Ameron $80,719 in expert witness fees.

Plaintiffs contend that the trial court abused its discretion in awarding Ameron $80,719 in expert witness fees. Plaintiffs' contention is based on two grounds. First, plaintiffs contend that Ameron's zero dollar waiver of costs offer to settle was not reasonable or made in good faith. Second, they contend that Ameron's expenses were not expert witness fees but abatement costs unrelated to the workers' compensation exclusivity rule on which the grant of summary judgment was based.

18

*Reasonableness of Offer*

"Section 998 is designed to encourage the settlement of lawsuits before trial. [Citation.] 'Its effect is to punish the plaintiff who fails to accept a reasonable offer from a defendant.' [Citation.] However, '"a good faith requirement"' is read into section 998, requiring that '"the settlement offer be 'realistically reasonable under the circumstances of the particular case'"' and that there be '""some reasonable prospect of acceptance. [Citation.]"' [Citation.] '"[A] party having no expectation that his offer will be accepted 'will not be allowed to benefit from a no-risk offer made for the sole purpose of later recovering large expert witness fees.'"' [Citation.]

'"""The reasonableness of a defendant's section 998 settlement offer is evaluated in light of 'what the offeree knows or does not know at the time the offer is made . . . .'"' [Citation.] 'Where the defendant obtains a judgment more favorable than its offer, '"the judgment constitutes prima facie evidence showing the offer was reasonable . . . ."' [Citation.]' [Citation.] '"Whether a section 998 offer was reasonable and made in good faith is left to 'the sound discretion of the trial court.'"' [Citation.] '"In reviewing an award of costs and fees under Code of Civil Procedure section 998, the appellate court will examine the circumstances of the case to determine if the trial court abused its discretion in evaluating the reasonableness of the offer or its refusal." [Citation.] '"["]The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power." [Citations.]"' [Citation.]"' (*Najah, supra*, 230 Cal.App.4th at pp. 143-144; *Bates v. Presbyterian Intercommunity Hospital, Inc.* (2012) 204 Cal.App.4th 210, 220 (*Bates*).)

19

Plaintiffs contend that Ameron's settlement offer was not reasonable because at the time Ameron made the offer, plaintiffs did not know the value of the waiver of costs. Instead, they believed that their wrongful death action was viable because Melendrez died of asbestos-caused mesothelioma; he brought asbestos-containing pipes home from work; Ameron did not dispute that the pipes came from its facility; and Ameron's summary judgment motion did not establish that the exposure at home was subject to the workers' compensation exclusivity rule. Plaintiffs also contend that Ameron's offer was disproportionate to its exposure because "jury verdicts in California involving mesothelioma are frequently in the multi-million dollar range." Plaintiffs further argue that the value of the waiver of costs was not apparent to them because, at the time of the offer, they were unaware that Ameron intended to designate Steve Long of Forensic Analytical as an expert witness or that Ameron had incurred $130,000 in survey, testing, and abatement costs.

In *Najah*, the defendant served an offer to settle for $30,000 under section 998. The plaintiffs did not accept, and after trial, judgment was entered in the defendant's favor. The defendant filed a memorandum of costs seeking $86,022.84, including over $40,000 in expert witness expenses. (*Najah, supra*, 230 Cal.App.4th at p. 133.) The trial court denied the plaintiffs' motion to tax costs, finding that the offer was made in good faith and that the plaintiffs had failed to show the expenses were unreasonable or unnecessary to the conduct of the litigation. On appeal, the plaintiffs argued that the offer to compromise was unreasonable in light of the evidence, which at the time of the offer indicated damages of $500,000. We affirmed, reasoning that "nothing precluded the trial court from concluding that the $30,000 offer was reasonable based on the

20

determination – with which we agree – that [the defendant] had no liability."
(*Najah, supra*, 230 Cal.App.4th at p. 144.)

As in *Najah*, the defendant in this case obtained a judgment more favorable than its settlement offer, resulting in a presumption that the offer was reasonable. (*Najah, supra*, 230 Cal.App.4th at pp. 143-144.)  The burden thus was on plaintiffs to establish "unreasonableness or lack of good faith."  (*Bates, supra*, 204 Cal.App.4th at p. 221.)  We conclude that plaintiffs have failed to meet their burden.

Plaintiffs rely on *Pineda v. Los Angeles Turf Club, Inc.* (1980) 112 Cal.App.3d 53, 63, in which the defendant's $2500 offer to settle a complaint seeking $10 million in damages was found to be unreasonable for purposes of section 998.  The appellate court found that the trial court "had ample reason to find that the offer was not reasonable" even though the defendant's liability "was tenuous indeed."  (*Ibid.*)  The court reasoned that in light of "the enormous exposure" the defendant faced, the trial court "could find that [the defendant] had no expectation that its offer would be accepted.  From this it follows that the sole purpose of the offer was to make [the defendant] eligible for the recovery of large expert witness fees at no real risk."  (*Ibid.*)

Although Ameron's offer might have been minimal in comparison to its exposure, this is not the only factor to consider in determining the reasonableness of a section 998 offer.  (See *Culbertson v. R.D. Werner Co., Inc.* (1987) 190 Cal.App.3d 704, 710 (*Culbertson*) ["the amount of demand by plaintiff . . . is only one of the many factors to be taken into consideration by the trial judge" in deciding reasonableness of section 998 offer].)  We find *Adams v. Ford Motor Co.* (2011) 199 Cal.App.4th 1475 (*Adams*) instructive.  There, the defendant made a section 998 settlement offer of $10,000 and a mutual waiver of costs, which the

plaintiffs rejected. After the jury returned a verdict in favor of the defendant, the defendant sought $167,570 in expert witness fees pursuant to section 998. The trial court denied the plaintiffs' motion to tax costs, and the appellate court affirmed. (*Id.* at p. 1484.) The court rejected the plaintiffs' argument the $10,000 offer was unreasonable "in light of the hundreds of thousands of dollars in costs, and $2 million in damages" they sought. (*Id.* at p. 1485.) The court reasoned that the offer "could not be evaluated simply in comparison to the judgment [they] sought, but it should have been measured in light of the likelihood that [they] would prevail at trial." (*Id.* at pp. 1485-1486.)

Similarly, in *Santantonio v. Westinghouse Broadcasting Co.* (1994) 25 Cal.App.4th 102 (*Santantonio*), the appellate court concluded the defendant's $100,000 offer was not unreasonable or unrealistic, even though the plaintiff claimed $900,000 in damages. (*Id.* at p. 118.) The court reasoned that the "[d]efendants contended they had no liability to [the plaintiff] at all, and the jury ultimately agreed." (*Ibid.*)

As in *Adams* and *Santantonio*, Ameron's offer should be evaluated not only in comparison to the amount of damages plaintiffs sought, but in light of their likelihood to prevail. Although plaintiffs may have believed they were likely to prevail, it is apparent that plaintiffs were cognizant of the applicability of the workers' compensation exclusivity rule. In their complaint, plaintiffs pleaded allegations pertinent to the dual capacity exception to the exclusivity rule, alleging that Melendrez obtained Ameron's asbestos-containing products from an independent third party who obtained the product from Ameron for valuable

22

consideration.[5] Ameron raised the exclusivity rule as an affirmative defense, and the exclusivity rule was the basis for Ameron's summary judgment motion.[6]

Notwithstanding plaintiffs' perception of their likelihood to prevail, "[w]hen a defendant perceives himself to be fault free and has concluded that he has a very significant likelihood of prevailing at trial, it is consistent with the legislative purpose of section 998 for the defendant to make a modest settlement offer. If the offer is refused, it is also consistent with the legislative intent for the defendant to engage the services of experts to assist him in establishing that he is not liable to the plaintiff. It is also consistent with the legislative purpose under such circumstances to require the plaintiff to reimburse the defendant for the costs thus incurred." (*Culbertson*, *supra*, 190 Cal.App.3d at pp. 710-711.)

Plaintiffs argue that the value of the waiver of costs was not apparent to them at the time of the offer because they did not know Ameron would designate Steve Long as an expert witness and they did not know Ameron had incurred $130,000 in costs. However, in June 2012, two months prior to the offer, counsel

---

[5]    The dual capacity doctrine, found in Labor Code section 3602, subdivision (b)(3), provides: "An employee, or his or her dependents in the event of his or her death, may bring an action at law for damages against the employer, as if this division did not apply . . . [¶] [w]here the employee's injury or death is proximately caused by a defective product manufactured by the employer and sold, leased, or otherwise transferred for valuable consideration to an independent third person, and that product is thereafter provided for the employee's use by a third person." Plaintiffs are not relying on the dual capacity exception on appeal, instead arguing that workers' compensation exclusivity does not apply at all.

[6]    In its memorandum in support of its summary judgment motion, Ameron cited *Ashdown v. Ameron Internat. Corp.* (2000) 83 Cal.App.4th 868, a case brought by the survivors of an employee of Ameron who died of an asbestos-related disease. The trial court granted summary judgment in favor of Ameron on the ground that neither the dual capacity nor the fraudulent concealment exception to workers' compensation exclusivity applied. The appellate court affirmed, concluding that neither exception to the exclusivity rule applied. (*Id.* at pp. 874-878.)

23

for Ameron sent plaintiffs' counsel a letter stating that Ameron's "removal/testing specialist Steve Long" had "recently learned . . . that a number of the subject 'pipe' elements located at the Melendrez home are actually providing structural support to portions of the house's roof and that of a storage shed," thus complicating the process of removal and testing. The letter went on to provide a timeline and description of the work to be done by Forensic Analytical, including "survey and sampling of subject pipe materials," tests for the presence of asbestos, and disposal of pipes found to contain asbestos. Plaintiffs thus were aware that Ameron had hired Steve Long and Forensic Analytical to survey, remove, and test the pipes for asbestos. Given this fact, and Ameron's reliance on the workers' compensation exclusivity rule, plaintiffs had "access to the facts that influenced the defendant's determination that the offer was reasonable." (*Adams, supra*, 199 Cal.App.4th at p. 1485.)

We find further support in *Regency Outdoor Advertising, Inc. v. City of Los Angeles* (2006) 39 Cal.4th 507, where the California Supreme Court held that section 998, subdivision (c)(1), authorizes an award of expert witness fees incurred both before and after a compromise offer is made, or at any time during the litigation. (*Id.* at p. 532.) The court stated, "awards of expert witness fees under Code of Civil Procedure section 998, subdivision (c) have *never* been tied to when these fees were incurred relative to a compromise offer." (*Ibid.*) Although "[t]he first sentence [of section 998, subdivision (c)(1)] limits recoverable 'costs' to those incurred from the time of the offer[,] [t]he second sentence, which relates to the 'costs of the services of expert witnesses,' contains no such limitation." (*Ibid.*) The statute thus contemplates that an offeree might not know the amount of expert witness fees at the time an offer is made. Plaintiffs' contention that it was not

24

aware of the amount of costs incurred by Ameron does not establish that the offer was unreasonable when it was made.

The trial court found the offer to be reasonable because it was made after a significant portion of discovery had been conducted and because Ameron succeeded on its summary judgment motion. Plaintiffs have failed to meet their burden of establishing that the offer was unreasonable. The amount of the offer in comparison to the potential recovery, plaintiffs' belief in the viability of their claim, and their alleged lack of awareness regarding the value of the waiver of costs do not establish that the trial court abused its discretion in finding the offer to be reasonable. (See *Najah, supra*, 230 Cal.App.4th at p. 145 ["[A]lthough potential damages were extensive, given the reasonable possibility that liability did not exist, the trial court did not abuse its discretion in determining that [the defendant's] offer was reasonable."]; *Santantonio*, *supra*, 25 Cal.App.4th at p. 118 [$100,000 offer not unreasonable despite $900,000 claim in damages because defendants contended they had no liability and the jury agreed].)

*Abatement Costs*

Plaintiffs contend that the costs incurred to survey and test the pipes on Melendrez's property were not necessary and reasonable for trial because they were abatement costs, not expert witness costs. We disagree. Ameron contends that it hired Forensic Analytical in order to establish that Melendrez's exposure to asbestos at home was minimal and thus was not a substantial factor in the development of his mesothelioma. Although plaintiffs are correct that there was no dispute that the pipes came from Ameron, Ameron needed to determine the amount and locations of the pipe on Melendrez's property in order to establish its defense that his exposure at home was not a substantial factor in causing his

25

mesothelioma. The work performed by Forensic Analytical to remove and test the pipe on Melendrez's property therefore was "actually incurred and reasonably necessary in . . . preparation for trial." (§ 998, subd. (c)(1).)

Although plaintiffs take issue with the trial court's estimate of $30,000 in abatement costs, plaintiffs do not provide evidence to establish that the court's estimate constituted an abuse of discretion. Plaintiffs contend that items listed on Forensic Analytical's bill, such as "project administration," "site inspection," "travel time," and "other vague descriptions of tasks related to abatement" established that Forensic Analytical's costs related to abatement and thus were not expert witness fees. However, these descriptions do not establish that Forensic Analytical's activities related solely to asbestos abatement. Had the trial court not granted Ameron's summary judgment motion, part of its defense would have been to establish that the amount of asbestos at Melendrez's home was minimal. It is not clear that Forensic Analytical's activities related to abatement rather than trial preparation by determining the amount of asbestos at Melendrez's home. (See *Adams*, *supra*, 199 Cal.App.4th at p. 1487 ["Whether an item listed on the memorandum was reasonably necessary is a question of fact to be decided by the trial court. [Citation.]"].)

Plaintiffs further rely on the fact that the costs incurred by Ameron in retaining Forensic Analytical related to the amount of asbestos exposure Melendrez faced at home and thus did not relate to the workers' compensation exclusivity ground on which it ultimately prevailed. However, plaintiffs cite no authority for the proposition that expert witness fees are not recoverable if the defendant obtains judgment in its favor based on an issue other than that for which the expert was retained. The statute does not include such a requirement, stating only that the court "may require the plaintiff to pay a reasonable sum to cover costs

26

of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the defendant." (§ 998, subd. (c)(1).) In fact, "[a]lthough the statute refers to expert witnesses, courts have recognized that 'section 998 . . . covers the cost of experts who aid in the preparation of the case for trial, even if they do not actually testify.' [Citation.]" (*Bates, supra*, 204 Cal.App.4th at p. 222.)

"We will reverse the trial court's determination only if we find that 'in light of all the evidence viewed most favorably in support of the trial court, no judge could have reasonably reached a similar result.' [Citation.]" (*Bates, supra*, 204 Cal.App.4th at p. 221.) We affirm the trial court's order granting in part and denying in part plaintiffs' motion to tax costs and ordering an award of Ameron's expert witness fees.

## DISPOSITION

The judgment in case No. B256928 is affirmed. The order in case No. B259423 is affirmed. The parties shall bear their own costs on appeal.

**CERTIFIED FOR PUBLICATION**


WILLHITE, J.

We concur:


EPSTEIN, P. J.


MANELLA, J.

27